1

2

3

4                       UNITED STATES DISTRICT COURT

5                      NORTHERN DISTRICT OF CALIFORNIA

6

7   KEITH ALLEN LEWIS,                      Case No.  14-cv-03324-HSG

        Plaintiff,
8                                           ORDER GRANTING DEFENDANTS'
        v.                                  MOTION FOR SUMMARY
9                                           JUDGMENT; DENYING PLAINTIFF'S
                                            MOTIONS FOR A TEMPORARY
10  ANDREW DEEMS, et al.,                   RESTRAINING ORDER

        Defendants.
11                                          Re: Dkt. Nos. 23, 29, 37, and 53

12

13                                INTRODUCTION

14          Plaintiff, a California prisoner currently incarcerated at San Quentin State Prison

15  ("SQSP"), filed this *pro se* civil rights action under 42 U.S.C. § 1983.  The Court found that,

16  liberally construed, the complaint stated a cognizable claim for deliberate indifference to

17  Plaintiff's serious medical needs in violation of the Eighth Amendment.  Docket No. 15 at 2.

18  Now before the Court is Defendants' motion for summary judgment.  Docket No. 29.  Plaintiff has

19  filed an opposition to the summary judgment motion, Docket No. 38, and two supplemental

20  declarations in support of his opposition, Docket Nos. 51 and 52.  Defendants have filed a reply.

21  *See* Docket No. 47.  Also pending before the Court are Plaintiff's motions for a temporary

22  restraining order, *see* Docket Nos. 23, 37 and 53, and various declarations in support of the

23  motions for a temporary restraining order, *see* Docket Nos. 26, 28, 46, and 48–50.  In deciding the

24  pending motions, the Court has considered the entire record, including Plaintiff's verified

25  complaint.[1]

26  _____

27  [1] A verified complaint may be used as an opposing affidavit under Rule 56, provided it is based on
    personal knowledge and sets forth specific facts admissible in evidence.  *See Schroeder v.*
28  *McDonald*, 55 F.3d 454, 460 & nn.10–11 (9th Cir. 1995) (treating plaintiff's verified complaint as
    opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746,

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

**BACKGROUND**

Plaintiff's claims concern his medical treatment once Dr. Garrigan became his primary care physician ("PCP") in 2012.

According to Plaintiff, at the time Dr. Garrigan became his PCP, he was being prescribed morphine to control his ongoing and acute pain, some of which had been caused by a failed 2008 shoulder surgery. Compl. at 7; Docket No. 38 at 3–4. Dr. Garrigan "unjustifiably" and "maliciously" tapered him off morphine, causing his pain to return to levels he had felt "5 ½ years prior." Compl. at 8. Dr. Garrigan continued to provide substandard medical care by prescribing psychotropic medications for pain management which were ineffective and caused adverse side effects; cancelling Plaintiff's follow-up visits with Dr. Lyons; "halting [Plaintiff's] recommended (R) lumbar spine MRI and neurologist referral by Lyons; refusing to provide him with a walking cane; and placing false information in his medical files. *Id.* at 8–11. Dr. Garrigan also informed Plaintiff that "no SQ[SP] PCPs will never (sic) properly treat Plaintiff." *Id.* at 11. Plaintiff's January 23, 2013 hip MRI indicated fluid and swelling and recommended a lumbar spine MRI. *Id.* at 8–9. Plaintiff's June 25, 2014 lumbar spine MRI indicated mild multi-level degenerative spinal disc disease. *Id.* at 10. Plaintiff concludes that his MRIs and ongoing pain indicate the need for an immediate referral to an "unbiased neurologist or neurosurgeon." *Id.* at 11.

Defendants dispute Plaintiff's characterization of his treatment. According to Dr. Garrigan, at the time she was assigned as Plaintiff's PCP in 2012, Plaintiff was taking 90 mg of extended release morphine twice a day for chronic pain. Docket No. 29-7 ("Garrigan Decl.) ¶ 4. Plaintiff was prescribed morphine starting in May 9, 2008 for uncontrolled pain in his left shoulder prior to his successful June 2008 shoulder surgery. *Id.*

At a March 22, 2012 visit, in response to Plaintiff's complaints of pain, Dr. Garrigan initially increased his morning morphine dose to 105 mg and maintained the evening dose at 90 mg. *Id.* and Docket No. 29-10 at 10. Plaintiff disputes this, stating that Dr. Jones had authorized the 105 mg twice daily dosage prior to Dr. Garrigan being assigned as his PCP and that when he

plaintiff stated, under penalty of perjury, contents were true and correct, and allegations were not based purely on information and belief but rather on personal knowledge).

requested an increase to 120 mg twice daily, Dr. Garrigan refused.  Compl. at 7.

On May 22, 2012, during an examination by Dr. Aggarwal, Plaintiff complained of pain in his right clavicle, as well as continuing pain in his left shoulder.  Garrigan Decl. ¶ 6 and Docket No. 29-10 at 10.  Plaintiff requested an increase in his morphine dosage.  Garrigan Decl. ¶ 6 and Docket No. 29-10 at 10.  Plaintiff has a fear of needles so he refused Dr. Aggarwal's recommendation of an AC Joint corticosteroid injection for his left shoulder pain.  Dr. Aggarwal therefore prescribed pain medication and temporarily increased Plaintiff's morphine dosage to 105 mg twice a day for a month.  Garrigan Decl. ¶ 6 and Docket No. 29-10 at 10.  At Plaintiff's June 29, 2012 visit, Dr. Aggarwal decided to continue Plaintiff's twice daily morphine dosage at 105 mg.  Garrigan Decl. ¶ 6 and Docket No. 29-10 at 2.

X-rays of Plaintiff's collarbone did not show any injury.  Garrigan Decl. ¶ 6 and Docket No. 29-10 at 8-9.  Plaintiff was scheduled for an MRI, but he could not tolerate it because if his claustrophobia.  Docket No. 29-9 at 48.  On July 24, 2012, Plaintiff had a CT of his sternoclavicular joint on the right, which was again normal.  Garrigan Decl. ¶ 6 and Docket No. 29-9 at 50.  He was also seen by Orthopedics, who assured him that sternoclavicular injuries resolve slowly over time and that no further intervention was needed.  Docket No. 29-9 at 48.

On July 27, 2012, Dr. Aggarwal again saw Plaintiff.  She continued Plaintiff's twice daily morphine dosage at 105 mg, but specified in her medical notes that the increased dosage was "for this acute injury and likely should go back down at some point."  Docket No. 29-9 at 49.

Despite the morphine, Plaintiff continued to report experiencing severe pain.  Plaintiff was scheduled for an MRI of the his left shoulder and sternoclavicular joint on August 30, 2012.  Docket No. 29-9 at 45.  Plaintiff was unable to proceed with the MRI due to claustrophobia despite being given 1 mg lorazepam prior to the MRI to assist with the claustrophobia.  *Id.*

On November 8, 2012, Dr. Garrigan saw Plaintiff in response to a new report of pain in his pelvic and hip area.  Garrigan Decl. ¶ 7.  During this visit, Dr. Garrigan began to question the efficacy of the high dose of morphine.  *Id.*  She also was concerned that the high dosage was perhaps negatively affecting Plaintiff's health by increasing his sensitivity to pain.  *Id.*  She based her concern on increasing evidence in medical literature and consensus in the medical community

United States District Court
Northern District of California

3

1    that opioid medications, like morphine, are ineffective in treating chronic pain and associated with

2    undesirable side effects, such as addiction, tolerance, and opioid-induced hyperalgesia, wherein a

3    patient's sensitivity to pain actually increases due to long-term use of opioid medications. *Id.* Dr.

4    Garrigan's medical notes for the November 8, 2012 visit reflect this concern:

5           Chronic pain syndrome with multiple areas of pain. The patient was initially
            started on morphine for his chronic left upper extremity pain due to prior surgeries.
6           I question the indication for high dose morphine at this point. Will need to do
            further chart review and initiate discussion with the patient in the future in regards
7           to a possible taper down of the pain medication. At this point, he likely has some
8           dependence and tolerance.

9    Docket No. 29-9 at 39.

10           On November 14, 2012, an x-ray was done of Plaintiff's pelvis, which was completely

11   normal. Docket No. 29-9 at 28.

12           On December 13, 2012, Plaintiff was again seen by Dr. Garrigan. Docket No. 29-9 at 36.

13   Dr. Garrigan informed Plaintiff that radiology reports from a November 15, 2012 study of the

14   pelvis were normal and showed no evidence of disease at the hip joint or at the sacroiliac joint.

15   Docket No. 29-9 at 36. Dr. Garrigan referred Plaintiff to physical therapy for assistance with back

16   program stretching. *Id.* at 35–36.

17           Plaintiff was seen by Dr. Lyons in the Orthopedics Clinic on December 27, 2012, who

18   recommended an MRI. Docket No. 29-9 at 28. Dr. Garrigan decided to put the MRI on hold and

19   evaluate Plaintiff's pain in a "stepwise" manner. *Id.*

20           On January 7, 2013, Plaintiff was seen by a physical therapist who recommended specific

21   exercises. Docket No. 29-9 at 31. On January 9, 2013, Plaintiff submitted a health care services

22   request, asking to see a neurologist to diagnose his back pain. Docket No. 29-9 at 32. He reported

23   that the physical therapy exercises had not addressed the pain. *Id.* On January 10, 2013, Plaintiff

24   was again seen by Dr. Lyons who put in a second request for an MRI, which Dr. Pratt signed off

25   on. *Id.* The MRI did not take place due to Plaintiff's claustrophobia. *Id.*

26           On January 14, 2013, an x-ray was done of Plaintiff's lumbar spine per Dr. Lyons' orders.

27   Docket No. 29-9 at 30. The x-ray was negative, and did not indicate any fracture, subluxation,

28   misalignment or lesions. *Id.* On January 23, 2013, an MRI was done of Plaintiff's right hip and

United States District Court
Northern District of California

4

1   right sacroiliac joint region.  Dr. Jaksha reviewed this MRI on January 23, 2013.  Dr. Jaksha

2   reported that Plaintiff had "mild bilateral hip [degenerative joint disease];" and "minimal ill-

3   defined edema superficial to the greater trochanter bilaterally."  Docket No. 29-9 at 27.  The

4   radiologist also noted "mild ill-defined edema in the right L5 pedicle that may relate to facet

5   [degenerative joint disease]" and recommended a lumbar spine MRI to exclude other causes of the

6   edema.  *Id.*

7          On January 26, 2013, Plaintiff submitted a health care services request, complaining that

8   he was still in excruciating pain, and that using a hot water bottle, recommended by Dr. Garrigan

9   for pain management, exacerbated his pain.  Docket No. 29-9 at 25.

10          On February 1, 2013, Plaintiff was seen by Dr. Leighton in response to his report of severe

11   pain.  Docket No. 29-9 at 23.  Dr. Leighton noted that Plaintiff was being given 105 mg of

12   morphine twice daily, and was also allowed 600 mg ibuprofen 4 times daily as needed.  *Id.*  Dr.

13   Leighton noted in Plaintiff's medical records that although Plaintiff reported being in severe pain

14   and hobbled while he was in the clinic, Plaintiff was able to get up from a chair and walk into the

15   clinic without really any significant difficulty.  *Id.*  Dr. Leighton reviewed the MRI report and

16   reported that it showed no definite abnormality and mild bilateral hip degenerative disease.  *Id.*

17   Dr. Leighton decided to defer treatment decisions to Dr. Garrigan because of Dr. Garrigan's

18   familiarity with Plaintiff's health history.  *Id.*  She also noted that Plaintiff had been "splitting staff

19   and having inappropriate followup by Orthopedics" which had not been requested by Dr. Garrigan

20   or any other physician.  *Id.*  Dr. Leighton cancelled his February 7, 2013 orthopedic appointment

21   and deferred to Dr. Garrigan as to whether Plaintiff required more orthopedic followup.  *Id.*

22          On February 4, 2013, Plaintiff was seen by a physical therapist, who noted that Plaintiff

23   had not been doing the recommended exercises.  Docket No. 29-9 at 22.  The physical therapist

24   reviewed the January 23, 2013 MRI and concluded that Plaintiff was most likely suffering from

25   inflammation and degeneration of muscle tissue based on the "innocuous" MRI which only

26   "showed mild issues."  *Id.*  The physical therapist prescribed a series of exercises for Plaintiff and

27   recommended a follow-up in three to four weeks.  *Id.*

28          On February 7, 2013, Plaintiff submitted a health care services request complaining of

United States District Court
Northern District of California

1 continuing pain in his hip and lower back. Docket No. 29-9 at 21. On February 21, 2013,

2 Plaintiff had his scheduled appointment with Dr. Garrigan. *Id*. at 19. Plaintiff informed Dr.

3 Garrigan that he wished to see a neurologist about his lower back pain and have further imaging

4 studies of his lower back. *Id.* Dr. Garrigan noted that while Plaintiff was in the clinic waiting

5 area, Plaintiff stood up from the chair without difficulty, walked to the clinic examination room

6 with a normal gait, and was comfortable crossing his left leg over his right knee. *Id.* Dr.

7 Garrigan's notes for the visit indicate that her review of Plaintiff's x-rays and MRI showed no

8 significant findings. *Id.* at 20. She recommended conservative management of Plaintiff's pain,

9 such as stretching and strengthening exercises. *Id.* She noted that she did not think escalation of

10 his pain medications was appropriate and that the pain medications should be tapered down in the

11 future. *Id.*

12        On March 11, 2013, Plaintiff was seen by a physical therapist who noted that Plaintiff now

13 had improved right hip/lumbar flexibility. Docket No. 29-9. The physical therapist reported that

14 Plaintiff complained of not receiving a lumbar MRI as recommended by the radiologist who

15 interpreted his January 23, 2013 MRI. *Id.* The physical therapist speculated that the radiologist

16 might have been unaware that Plaintiff had already had a lumbar MRI performed recently when he

17 made the suggestion. *Id.*

18        On March 22, 2013, Plaintiff submitted another health care services request, complaining

19 of continuing acute pain. Docket No. 29-9 at 17. He reported that the morphine and naproxen

20 were not alleviating the pain. *Id.* He also requested a lumbar spine MRI "due to fluid around

21 vertebrae L4 and L5." *Id.* Plaintiff was seen by a nurse who discussed his requests with Dr.

22 Garrigan. *Id.* Dr. Garrigan denied his request for a lumbar spine MRI as not medically indicated

23 because his January 14, 2013 lumbar spine x-ray showed a normal lumbar spine and because his

24 January 23, 2013 hip MRI showed "mild disease in the hip and sacro-iliac joints that did not

25 require surgical intervention. *Id.*; *see also* Garrigan Decl. ¶¶ 8, 13.

26        On June 24, 2013, Plaintiff submitted another health care services request complaining

27 about his acute pain. Docket No. 29-9 at 13. Plaintiff was seen on June 27, 2013 by Dr. Grant.

28 *Id.*; *see also* Garrigan Decl. ¶ 9. Plaintiff informed Dr. Grant that he needed more morphine to

United States District Court
Northern District of California

United States District Court
Northern District of California

1    alleviate the pain.  Docket No. 29-9 at 17 and Garrigan Decl. ¶ 9.  Plaintiff also requested a

2    neurologist, a bone scan, and a dedicated MRI of his lumbar spine.  Docket No. 29-9 at 17.  Dr.

3    Grant deferred these issues to Dr. Garrigan.  Docket No. 29-9 at 17 and Garrigan Decl. ¶ 9.  Dr.

4    Grant also stated in his medical notes that he "completely agree[d]" with Dr. Garrigan's

5    assessment that there was no need for escalation of pain medication and her recommendation of

6    conservative management.  Docket No. 29-9 at 17.

7         On July 30, 2013, due to various scheduling delays, Plaintiff saw Dr. Garrigan for a

8    follow-up on the March 22, 2013 appointment.  Docket No. 29-7 at 9 and Garrigan Decl. ¶ 10.

9    Plaintiff stated that he was "hurting all over."  Docket No. 29-7 at 9 and Garrigan Decl. ¶ 10.

10   Plaintiff again requested to be seen by a neurologist or other specialist, and requested an MRI of

11   his lumbar spine.  Docket No. 29-7 at 9 and Garrigan Decl. ¶ 10.  Dr. Garrigan decided to start

12   tapering Plaintiff off morphine.  Docket No. 29-7 at 10 and Garrigan Decl. ¶ 10.  In her medical

13   notes, she expressed concern that the morphine was ineffective in alleviating Plaintiff's pain, and

14   that the extended high dosage of morphine had either increased Plaintiff's sensitivity to pain or

15   resulted in Plaintiff having a high tolerance for morphine.  Docket No. 29-7 at 9 and Garrigan

16   Decl. ¶ 10.  She prescribed decreasing the dosage by 15 mg every two weeks until Plaintiff was

17   tapered off the medication.  Docket No. 29-7 at 9 and Garrigan Decl. ¶ 10.  She encouraged

18   Plaintiff to use nonsteroidals for his pain, and stated that she would consider prescribing a

19   nonnarcotic pain agent during the taper if necessary.  Docket No. 29-7 at 9 and Garrigan Decl.

20   ¶ 10.  She also notified Plaintiff's psychiatrist about the tapering plan so that the Mental Health

21   staff could provide Plaintiff with support during this transition.  Docket No. 29-7 at 9 and

22   Garrigan Decl. ¶ 10.  Dr. Garrigan denied Plaintiff's request for a cane as it was not medically

23   indicated but agreed to a chrono for a lumbar corset for six months to see if it would help with

24   Plaintiff's right lumbar pain.  Docket No. 29-7 at 9.  Dr. Garrigan also ordered additional testing to

25   determine if there could be other causes for Plaintiff's pain.  *Id.*

26        Over the next month, Plaintiff submitted three requests for health care services, each time

27   complaining about the pain in his back and shoulder, and insisting that his morphine dosage

28   should be increased, not decreased.  Docket No. 29-7 at 3–8.  On August 29, 2013, Plaintiff had

United States District Court
Northern District of California

1   another follow-up appointment with Dr. Garrigan.  *Id.* at 2–3.  He again informed Dr. Garrigan of

2   the severe pain he was experiencing.  *Id.* at 3.  Dr. Garrigan suggested alternative pain

3   medications, but Plaintiff stated that he felt morphine was the most effective.  *Id.* at 3.

4          On September 26, 2013, Plaintiff's January 23, 2013 hip MRI was reviewed again by

5   another doctor.  Docket No. 29-9 at 26 and Docket No. 29-8 at 50.  The doctor concluded that the

6   MRI was normal and that no further MRIs were needed.  Docket No. 29-9 at 26 and Docket No.

7   29-8 at 50.  Plaintiff, however, claims that the doctor's report of the presence of moderate right

8   and left hydroceles indicates that he has tumors, and that he still has fluid and swelling in his hip.

9   Compl. at 9.

10         Plaintiff continued to complain of pain and was seen on the Nurse Line multiple times.  On

11  October 31, 2013, Dr. Garrigan saw Plaintiff for a follow-up visit.  Docket No. 29-8 at 45.

12  Plaintiff complained of being in great pain.  *Id.*  Dr. Garrigan suggested a short list of alternative

13  medications.  *Id.* at 46.  Plaintiff stated that he was reluctant to take psychotropic medications

14  because they caused him to feel suicidal.  *Id.*  He agreed to try oxcarbazepine and was prescribed

15  300 mg twice daily to be nurse-administered.  *Id.*  However, the next day, Plaintiff submitted a

16  health care services request claiming that the oxcarbazepine had caused him to have blurred

17  vision, upset stomach, and bad thoughts.  *Id.* at 44.  When seen on the Nurse Line a couple days

18  later, Plaintiff denied having the adverse side effects.  *Id.*  Plaintiff's oxcarbazepine was

19  discontinued and he agreed to try Effexor for his pain.  *Id.*  Plaintiff was again seen by Dr.

20  Garrigan on November 25, 2013, and agreed to try venlafaxine for his pain.  *Id.* at 38.  Two weeks

21  later, Plaintiff submitted a health services request form, complaining that the venlafaxine was not

22  relieving his pain and resulted in the following adverse side effects: severe headaches, blurred

23  vision, perspiration, and insomnia.  *Id.* at 34.  Plaintiff was seen soon thereafter by Dr. Garrigan,

24  on December 19, 2013.  *Id.* at 32–33.  Dr. Garrigan agreed that Plaintiff should discontinue his use

25  of venlafaxine.  *Id.*  Plaintiff clarified that his pain was specifically in his low back, left shoulder,

26  and the right clavicle region.  *Id.*  Because Plaintiff had not responded to other medications, Dr.

27  Garrigan decided to monitor Plaintiff before prescribing further medications.  *Id.*  She encouraged

28  him to use nonsteroidals in the meantime.  *Id.*

1     Plaintiff was again seen by Dr. Garrigan on January 13, 2014.  Docket No. 29-8 at 30.  At

2  this time, Plaintiff was back on venlafaxine to address his anxiety.  *Id.*  However, he continued to

3  complain of pain.  *Id.*  Dr. Garrigan decided to wait until his venlafaxine dosage was stable before

4  considering trials of other medications.  *Id.*

5     Plaintiff continued to see a physical therapist throughout early 2014.  Docket No. 29-8 at

6  28–29.  The physical therapist notes indicate that Plaintiff continued to experience pain despite

7  attempting the physical therapy exercises.  *Id.*  On February 24, 2014, Plaintiff initiated a chrono

8  requesting a cane.  *Id.* at 28.

9     On March 20, 2014, Plaintiff had his last visit with Dr. Garrigan.  Docket No. 29-8 at 26.

10  Dr. Garrigan noted that she did not believe that Plaintiff had any ongoing disability and therefore

11  did not recommend a cane.  *Id.*  She authorized a temporary short cane chrono to address

12  Plaintiff's difficulty ambulating.  *Id.*  Because Plaintiff had initiated the instant litigation against

13  Dr. Garrigan, Dr. Garrigan transferred his case to Dr. Leighton.  *Id.*

14     On May 6, 2014, Plaintiff was seen by Dr. Leighton.  She noted that Plaintiff had a

15  "history of a lot of muscoloskeletal pain complaints with very little in the way of MRI and x-ray

16  findings to back up his complaints of severe pain."  Docket No. 29-8 at 22.  During subsequent

17  visits with Dr. Leighton, Plaintiff requested morphine to address his pain.  *Id.* at 20.  Dr.

18  Leighton's medical notes indicate that she refused the request because Plaintiff's x-rays and MRIs

19  did not indicate a need for opiate pain medication management.  *Id.*  Dr. Leighton suggested trying

20  other medications, but Plaintiff refused.  *Id.*  Dr. Leighton ordered an MRI of Plaintiff's lumbar

21  spine, which was administered on June 25, 2014.  *Id.* at 17.  The results showed mild degenerative

22  disease without stenosis, which does not require treatment by a neurologist.  Garrigan Decl. ¶ 13.

23  Plaintiff disagrees with the doctors' reading of the MRI, alleging that the MRI results showing that

24  he has mild multi-level degenerative spinal disc disease, herniated/bulging disc on vertebrae L4,

25  L5, and L5-S1, as well as moderate facet joint arthrosis on vertebrae L5-S1, indicate he requires

26  evaluation by a neurologist or neurosurgeon.  Compl. at 10.

27

28

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

# DISCUSSION

## I.    Summary Judgment Motion

### A.    Standard of Review

Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

A court shall grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (citing Fed. R. Civ. P. 56(e) (amended 2010)).

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

### B.    Analysis

Plaintiff alleges that Defendants' failure to restore his prior morphine dosage; failure to

10

1    refer him to a neurosurgeon or spine specialists to treat his lower back; failure to order him a

2    lumbar spine MRI; failure to refer him to an orthopedic surgeon for his left shoulder pain; and

3    failure to provide him with a walking cane[2] violates Defendants' obligations to him under state

4    law and violates the Eighth Amendment.

1)    **Plaintiff's Requests for Orthopedic Referral and Walking Cane**

6         Defendants argue that Plaintiff's claims regarding his requests for an orthopedic referral

7    and a walking cane should be dismissed for failure to exhaust administrative remedies.

8         The Prison Litigation Reform Act of 1995 ("PLRA") amended 42 U.S.C. § 1997e to

9    provide that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C.

10   § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional

11   facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).

12   Although previously within the discretion of the district court, exhaustion in prisoner cases

13   covered by § 1997e(a) is now mandatory.  *Porter v. Nussle*, 534 U.S. 516, 524 (2002).  Exhaustion

14   is a prerequisite to all inmate lawsuits pertaining to prison life, whether they involve general

15   circumstances or particular episodes, and whether they allege excessive force or some other

16   wrong.  *Id.* at 532.

17        The PLRA exhaustion requirement requires "proper exhaustion" of all available

18   administrative remedies.  *Woodford v. Ngo*, 548 U.S. 81, 93 (2006).  "Proper exhaustion demands

19   compliance with an agency's deadlines and other critical procedural rules because no adjudicative

20   system can function effectively without imposing some orderly structure on the course of its

21   proceedings."  *Id.* at 90–91 (footnote omitted). Whether an inmate's grievance satisfies the

22   PLRA's exhaustion requirement is determined by the prison's own grievance process.  *Griffin v.*

23   *Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009).

24        The exhaustion requirement of the PLRA is intended to serve a number of purposes,

[2] In his prayer for relief, Plaintiff asks "to be provided all of the necessary medical appliances in which [Plaintiff] needs to help in his efforts to have his well documented medical problems and exquisite/acute pain matters managed and alleviated, and [Plaintiff's] other debilitating conditions."  Compl. at 15.  In the body of the complaint, the only medical "appliance" referred to is a walking cane.  *Id.* at 9.  Accordingly, the Court finds that Plaintiff's complaint alleges that the denial of Plaintiff's request for a walking cane violated the Eighth Amendment.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    including providing an opportunity for corrections officials to address complaints internally,

2    deterring frivolous lawsuits, and creating an administrative record allowing courts to evaluate the

3    relative merits of claims.  *See Porter*, 534 U.S. at 525.  The purpose of a grievance is to alert the

4    prison to a problem and facilitate its resolution, not to lay groundwork for litigation.  *Griffin*, 557

5    F.3d at 1120.  The grievance should include sufficient information "to allow prison officials to

6    take appropriate responsive measures."  *Id.* (citation and internal quotation omitted).  The

7    grievance need not include legal terminology or legal theories unless they are needed to provide

8    notice of the harm being grieved.  *Id.*  Nor must a grievance include every fact necessary to prove

9    each element of an eventual legal claim.  *Id.*  Where a prison's grievance procedures do not

10   specify the requisite level of factual specificity required in the grievance, "'a grievance suffices if

11   it alerts the prison to the nature of the wrong for which redress is sought.'"  *Id.* (quoting *Strong v.

12   David*, 297 F.3d 646, 650 (7th Cir. 2002)).

13          The failure to exhaust administrative remedies is an affirmative defense that must now be

14   raised in a motion for summary judgment.  *See Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir.

15   2014) (en banc).  In bringing such a motion, the defendant has the initial burden to prove "that

16   there was an available administrative remedy, and that the prisoner did not exhaust that available

17   remedy."  *Id.* at 1172.  If the defendant carries that burden, "the burden shifts to the prisoner to

18   come forward with evidence showing that there is something in his particular case that made the

19   existing and generally available administrative remedies effectively unavailable to him."  *Id.*  The

20   ultimate burden of proof remains with the defendant, however.  *Id.*  "If material facts are disputed,

21   summary judgment should be denied, and the district judge rather than a jury should determine the

22   facts."  *Id.* at 1166.

23          The Court next turns to the administrative remedies available to California inmates.  The

24   California Department of Corrections and Rehabilitation ("CDCR") provides its inmates and

25   parolees the right to appeal administratively "any policy, decision, action, condition, or omission

26   by the department or its staff that the inmate or parolee can demonstrate as having a material

27   adverse effect upon his or her health, safety, or welfare."  15 Cal. Code Regs. § 3084.1(a).  On

28   January 28, 2011, California prison regulations governing inmate grievances were revised.  Now

1    inmates proceed through three levels of appeal to exhaust the appeal process: (1) formal written

2    appeal on a CDC 602 inmate appeal form, (2) second level appeal to the institution head or

3    designee, and (3) third level appeal to the CDCR director.  15 Cal. Code Regs. §§ 3084.1(b),

4    3084.7.  Under specific circumstances, the first level review may be bypassed.  *Id.*  The third level

5    of review constitutes the decision of the Secretary of the CDCR and exhausts a prisoner's

6    administrative remedies.  *Id.* § 3084.7(d)(3).  A California prisoner is required to submit an inmate

7    appeal at the appropriate level and proceed to the highest level of review available to him.  *Butler*

8    *v. Adams*, 397 F.3d 1181, 1183 (9th Cir. 2005); *Bennett v. King*, 293 F.3d 1096, 1098 (9th Cir.

9    2002).  Since the 2011 revision, in submitting a grievance, an inmate is required to "describe the

10   specific issue under appeal and the relief requested" and  "state all facts known and available to

11   him/her regarding the issue being appealed at the time."  15 Cal. Code Regs. § 3084.2(a).

12          The Court finds that Defendants have met their initial burden of proving "that there was an

13   available administrative remedy, and that the prisoner did not exhaust that available remedy."

14   *Albino*, 747 F.3d at 1172.  In his complaint, Plaintiff identified four administrative appeals[3] that he

15   claims exhausted his administrative remedies.  None of these appeals request, or even mention, a

16   referral to an orthopedic specialist or a walking cane.  *See* Docket No. 29, Exs. A–D.  In response,

17   Plaintiff states that, in addition to the above-referenced health care appeals, he has informed

18   Defendants of his medical needs by submitting numerous health care requests;[4] by submitting

19   letters from both himself and his attorney Pamala Sayasane to various prison officials;[5] by filing a

20   request for reasonable modification or accommodation (CDC Form 1824), Log No. # 06-09-

21   01736;[6] and via "the documents listed in Plaintiff's received January 16, 2015 requests for the

22   production of documents . . . which Defendants refused to produce."  Docket No. 38 at 5 (sic).

23   None of these efforts are sufficient to satisfy the PLRA's exhaustion requirement.

24

25   [3] The four administrative appeals are health-care appeals #SC-HC-13037714, #SC-HC13038233,
26   #SC-HC13038335, and #SC-HC13038415.  They can be found in the record at Docket No. 29,
     Exs. A–D.
27   [4] These requests have been filed in the record by Plaintiff at Docket No. 26 at 16–61.
     [5] These letters have been filed in the record by Plaintiff at Docket No. 28 at 4–23.
28   [6] This CDC Form 1824, Log No. # 06-09-01736, has been filed in the record by Plaintiff at Docket
     No. 38 at 25–33.

United States District Court
Northern District of California

1    First, neither the requests for health care services nor the letters are part of the CDCR

2    administrative remedy process.  Accordingly, these requests and letters do not satisfy the PLRA's

3    exhaustion requirement.  *See*, *e.g.*, *Jones v. Bock*, 549 U.S. 199, 217–18 (2007) (compliance with

4    prison grievance procedures is required by the PLRA to "properly exhaust").

5    Second, CDC Form 1824, Log No. # 06-09-01736, requesting reinstatement of a chrono

6    for an egg crate and ice, does not satisfy the PLRA's exhaustion requirement.  It does not appeal

7    the issue to the third and final level, and the issue grieved is distinct from the walking cane claim

8    raised in the complaint.  According to the documents filed by Plaintiff, Log No. # 06-09-01736

9    was only appealed to the second level, *see* Docket No. 38 at 31–33, and not to the third and final

10   level, as required by CDCR regulations for exhaustion, see 15 Cal. Code Regs. §§ 3084.1(b),

11   3084.7.  Moreover, even liberally construed, Log No. # 06-09-01736 does not have the same

12   subject and same request for relief as his complaint in this instant action.  Log No. # 06-09-01736

13   was submitted on November 23, 2009, and complained that Dr. Jones improperly rescinded his

14   chrono for an egg crate mattress and ice, both of which had been recommended by Dr. Lyons, in

15   violation of the Americans with Disabilities Act ("ADA").  Docket No. 38 at 25.  This is distinct

16   from Plaintiff's request for a walking cane.  Although Plaintiff does request unspecified medical

17   appliances in his prayer for relief, there is no mention of an ADA violation in his complaint.  Nor

18   does the complaint discuss Dr. Jones rescinding Plaintiff's chrono for an egg crate mattress and

19   ice.  Log No. # 06-09-01736 therefore does not exhaust Plaintiff's administrative remedies with

20   respect to his claims regarding an orthopedic specialist, a walking cane, or medical appliances

21   because (1) it did not exhaust all available remedies, *see Brown v. Valoff*, 422 F.3d 926, 935 (9th

22   Cir. 2005) (obligation to exhaust persists so long as some remedy is available); and (2) it does not

23   have the same subject and same request for relief as the claims in the instant action, *see*, *e.g.*,

24   *Morton v. Hall*, 599 F.3d 942, 946 (9th Cir. 2010) (grievance that complained of visitation

25   restrictions, and did not mention an assault or theorize that the visitation restriction imposed was

26   related to the assault, was insufficient to put prison officials on notice that staff conduct

27   contributed to the assault).

28   Third, Plaintiff's vague reference to documents within Defendants' possession that have

United States District Court
Northern District of California

14

1   not been produced via discovery does not constitute evidence "showing that there is something in

2   [Plaintiff's] particular case that made the existing and generally available administrative remedies

3   effectively unavailable to him." *Albino*, 747 F.3d at 1172. Plaintiff does not specify what these

4   documents are. Nor does he allege that these documents are grievances that exhaust his claims

5   regarding an orthopedic specialist and a walking cane. Conclusory allegations that there are

6   documents within Defendants' possession that "request[] for these def's, all of them, to provide

7   [Plaintiff] with adequate constitutionally abiding medical health-care . . . all fell on the deaf and

8   uncaring ears of these defs" are insufficient to defeat summary judgment for failure to exhaust.

9   *Cf. White v. McGinnis*, 131 F.3d 593, 595 (6th Cir. 1997).

10                        **2)      Eighth Amendment Claims**

11          Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs,

12   in violation of the Eighth Amendment, when they discontinued his morphine prescription;

13   prescribed him psychotropic medications to address his pain; refused him a lumbar spine MRI;

14   and refused him a referral to a neurologist. Plaintiff's chronic, acute pain is a serious medical

15   need for purposes of an Eighth Amendment claim. *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th

16   Cir. 1992) ("existence of chronic and substantial pain [is an] . . . indication[] that a prisoner has a

17   'serious' need for medical treatment"), *overruled on other grounds by WMX Technologies, Inc. v.*

18   *Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

19                        **a)      Standard**

20          Deliberate indifference to a serious medical need violates the Eighth Amendment's

21   proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104

22   (1976); *McGuckin*, 974 F.2d at 1059; *Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986). A

23   determination of "deliberate indifference" involves an examination of two elements: the

24   seriousness of the prisoner's medical need and the nature of the defendant's response to that need.

25   *See McGuckin*, 974 F.2d at 1059.

26          A prison official is deliberately indifferent if he knows that a prisoner faces a substantial

27   risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer*

28   *v. Brennan*, 511 U.S. 825, 837 (1994). The prison official must not only "be aware of facts from

United States District Court
Northern District of California

15

1   which the inference could be drawn that a substantial risk of serious harm exists," but he "must

2   also draw the inference." *Id.* If a prison official should have been aware of the risk but was not,

3   then the official has not violated the Eighth Amendment, no matter how severe the risk. *Gibson v.*

4   *County of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002). Mere negligence, or even gross

5   negligence, is not enough. *Farmer*, 511 U.S. at 835–36 & n.4.

6         A showing of nothing more than a difference of medical opinion as to the need to pursue

7   one course of treatment over another is insufficient, as a matter of law, to establish deliberate

8   indifference. *See Toguchi v. Chung*, 391 F.3d 1051, 1058–60 (9th Cir. 2004); *Sanchez v. Vild*, 891

9   F.2d 240, 242 (9th Cir. 1989); *Mayfield v. Craven*, 433 F.2d 873, 874 (9th Cir. 1970). In order to

10  prevail on a claim involving choices between alternative courses of treatment, a plaintiff must

11  show that the course of treatment the doctor chose was medically unacceptable under the

12  circumstances and that he chose this course in conscious disregard of an excessive risk to

13  plaintiff's health. *Toguchi*, 391 F.3d at 1058; *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir.

14  1996) (citing *Farmer*, 511 U.S. at 837).

15                  **b)**      **Claim against Dr. Garrigan**

16        After reviewing all the admissible evidence in the record, the Court finds that Plaintiff has

17  failed to raise a triable issue of fact as to whether Dr. Garrigan was deliberately indifferent to

18  Plaintiff's serious medical needs when she discontinued his morphine prescription; prescribed him

19  psychotropic medications to address his pain; refused him a lumbar spine MRI; and refused him a

20  referral to a neurologist.

21        The record contradicts Plaintiff's conclusory assertion that Dr. Garrigan's discontinuation

22  of his morphine prescription was malicious and unjustified. Dr. Garrigan discontinued Plaintiff's

23  morphine prescription after observing him for fifteen months because she sought to find more

24  effective pain treatment for him.

25        Dr. Garrigan became Plaintiff's PCP in 2012. Initially, she increased his morphine dosage.

26  Garrigan Decl. ¶¶ 4, 7 and Docket No. 29-10 at 10. She maintained Plaintiff on this increased

27  dosage for fifteen months. During this time, Plaintiff's pain increased or stayed the same. Dr.

28  Garrigan referred Plaintiff for physical therapy to address the pain. Starting July 30, 2013, Dr.

United States District Court
Northern District of California

1    Garrigan tapered Plaintiff off morphine because the morphine had not alleviated Plaintiff's pain;

2    because Plaintiff's x-rays and MRI did not indicate a need for morphine; and because recent

3    literature and consensus in the medical community indicated that morphine was ineffective in

4    treating chronic pain and could increase a patient's sensitive to pain after long-term use.  Garrigan

5    Decl. ¶ 10; Docket No. 29-7 at 10; Docket No. 29-8 at ¶¶ 19–20.  After tapering Plaintiff off

6    morphine, Dr. Garrigan worked with Plaintiff to identify alternative medications and methods to

7    manage his pain, which have so far been unsuccessful.

8             Plaintiff argues that Dr. Garrigan's treatment plan is medically unacceptable because he

9    continues to be in acute pain and because his pain was managed while he was on morphine.

10   However, Dr. Garrigan's treatment plan is based on other, equally compelling factors: Plaintiff's

11   continuing complaints of pain over a 15-month period despite a high dosage of morphine; MRIs

12   and x-rays that do not indicate a need for morphine; and relevant medical literature.  Moreover,

13   other SQSP physicians agreed with Dr. Garrigan's assessment.  In prescribing Plaintiff morphine

14   in July 2012, Dr. Aggarwal noted that an increased dosage was for Plaintiff's alleged collarbone

15   injury but that the dosage should go back down.  Docket No. 29-9 at 49.  Dr. Grant examined

16   Plaintiff on March 23, 2013, and agreed with Dr. Garrigan that "there was no need for escalation

17   of pain medication."  Docket No. 29-9 at 17.  When Plaintiff was transferred to Dr. Leighton's

18   care in 2014, Dr. Leighton also concluded after reviewing Plaintiff's records and examining him

19   that there was no need for opiate pain medication management.  Docket No. 29-8 at 22.

20            Plaintiff's allegations that other inmates are being maintained on long-term morphine

21   prescriptions does not create a triable issue of fact as to whether his morphine prescription should

22   have been continued.  The dispositive question in considering an Eighth Amendment claim is

23   whether prison officials failed to take reasonable steps to abate an inmate's serious medical needs,

24   *Farmer*, 511 U.S. at 837, and not whether an inmate's medical treatment is similar to that of other

25   inmates.

26            Similarly, the record does not support Plaintiff's assertion that the prescription of

27   psychotropic medications violated the Eighth Amendment.  To the extent that Plaintiff had

28   negative side effects from the psychotropic medications, the medications were immediately

United States District Court
Northern District of California

17

1    discontinued per his request.[7]  *See*, *e.g.*, Docket No. 29-8 at 32–33 and 44.  The psychotropic

2    medications' failure, thus far, to alleviate Plaintiff's pain does not raise a triable issue of fact as to

3    whether Dr. Garrigan was taking reasonable steps to address his serious medical needs.  As

4    discussed above, Dr. Garrigan had numerous well-considered reasons for finding an alternative

5    pain management solution for Plaintiff.

6            The record also does not support Plaintiff's assertion that the failure to refer Plaintiff for a

7    lumbar spine MRI[8] and for examination by a neurologist violated the Eighth Amendment. Plaintiff

8    had an x-ray of his pelvis administered on November 14, 2012; an x-ray of his lumbar spine

9    administered on January 14, 2013; an MRI of his right hip and right sacroiliac joint region

10   administered on January 23, 2013, and an MRI of his lumbar spine administered on June 25, 2014,

11   all of which were negative. Dr. Garrigan reviewed these x-rays and MRIs and concluded that they

12   did not support reinstating Plaintiff's morphine prescription or an examination by a neurologist.

13   The second doctor who reviewed Plaintiff's January 26, 2013 also agreed that no further MRIs

14   were needed.  *See* Docket No. 29-6 at 26 and Docket No. 29-8 at 50.  Dr. Tootell also reviewed

15   Plaintiff's MRIs and concluded that a referral to a neurologist was not needed.  Docket No. 29-8 at

16   ¶¶ 26–31.

17           Plaintiff has not shown a difference of medical opinion as to whether he should be

18   prescribed morphine or psychotropic medications, or as to whether he should be referred for a

19   lumbar spine MRI or for examination by a neurologist.  Nor has he raised a triable issue of fact

20   that Dr. Garrigan's course of treatment was medically unacceptable under the circumstances and

21   that she chose this course in conscious disregard of an excessive risk to Plaintiff's health.

22   Viewing the record in the light most favorable to Plaintiff, he has failed, as a matter of law, to

23   raise a genuine issue of fact as to whether Dr. Garrigan was deliberately indifferent to his serious

24   medical needs.  *See Toguchi*, 391 F.3d at 1058–60.

25

26

27   [7] One of the discontinued medications, venlafaxine, was re-prescribed to Plaintiff at his request to
     address his anxiety. Docket No. 29-8 at 30.

28   [8] Plaintiff's June 25, 2014 lumbar spine MRI took place after he filed this instant action and may
     render his request for a lumbar spine MRI moot.

United States District Court
Northern District of California

1

        c)       **Claims against Deems, Tootell, Pratt and Chappell**

2        Plaintiff has not alleged any facts showing that SQSP Chief Medical Executive ("CME")

3    Deems, SQSP Chief Medical Officer ("CMO") Tootell, SQSP Chief Physician and Surgeon Dr.

4    Pratt, and SQSP Warden Chappell were directly involved in Plaintiff's medical care.  Rather,

5    Plaintiff bases their liability on (1) their knowledge of SQSP medical staff's failure to treat his

6    medical needs;[9] (2) their failure to act upon that knowledge and procure effective medical

7    treatment for him; and (3) their capacity as supervisors to direct their subordinates.[10]

8        A supervisor may be liable under § 1983 upon a showing of (1) personal involvement in

9    the constitutional deprivation or (2) a sufficient causal connection between the supervisor's

10    wrongful conduct and the constitutional violation.  *Henry A. v. Willden*, 678 F.3d 991, 1003–04

11    (9th Cir. 2012) (citing *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011)); *Starr v. Baca*, 652

12    F.3d 1202, 1207 (9th Cir. 2011).  An administrator may be liable for deliberate indifference to a

13    serious medical need if he or she fails to respond to a prisoner's request for help.  *Jett v. Penner*,

14    439 F.3d 1091, 1098 (9th Cir. 2006) (holding that evidence of prisoner's letter to administrator

15    alerting him to constitutional violation sufficient to generate genuine issue of material fact as to

16    whether administrator was aware of violation, even if he denies knowledge and there is no

17

18    ───────────────

[9] Plaintiff informed CME Deems that SQSP staff were not providing the appropriate medical
19    treatment in a letter dated August 12, 2013 sent by Plaintiff's attorney, Pamala Sayasane, Compl.
      at 22; and via a copy of an August 29, 2013 document detailing Dr. Garrigan's alleged "unethical
20    and adverse" treatment of Plaintiff, *id.* at 26.  Plaintiff informed CMO Tootell of the same in
      letters dated August 1, 2012, February 21, 2013, August 12, 2013, August 22, 2013, Docket No.
21    28 at 13–15, 18, 21, and 22; in letters dated August 26, 2013, and September 6, 2013 sent by
      Plaintiff's attorney, Pamala Sayasane, Compl. at 22 and 24; via a copy of an August 29, 2013
22    document detailing Dr. Garrigan's alleged "unethical and adverse" treatment of Plaintiff, *id.* at 26;
      and via a lawsuit that he filed against her and other SQSP staff in Marin County Superior Court on
23    December 15, 2014, Docket No. 29-6 at 8–14.  Plaintiff informed Dr. Pratt of the same in a letter
      dated May 14, 2014, *see* Compl. at 29–30; and via a lawsuit that he filed against her and other
24    SQSP staff in Marin County Superior Court on December 15, 2014, Docket No. 29-6 at 8–14.
      Plaintiff informed Warden Chappell of the same via a lawsuit that he filed against him and other
25    SQSP staff in Marin County Superior Court on December 15, 2014, *id.* at 8–14.
[10] Plaintiff argues that Dr. Pratt is liable because, in her capacity as SQSP Chief Physician and
26    Surgeon, she reviews all health care appeals and "has the authority to do the right thing, as well as
      order her subordinates, to do the constitutionally correct medical treatment plans."  Docket No. 38
27    at 7–8.  Plaintiff argues that Warden Chappell, CME Deems, and CMO Tootell are liable because,
      in their respective capacities as SQSP Warden, CME and CMO, they are personally responsible
28    for the proper training, supervision, and action of all SQSP staff, including medical personnel.
      Compl. at 11 and Docket No. 29-6 at 14.

1  evidence the letter was received).

2  As discussed supra in I.B.2.b, Dr. Garrigan's actions did not violate the Eighth

3  Amendment.  Accordingly, the supervisory liability claims against CME Deems, CMO Tootell,

4  Dr. Pratt, and Warden Chappell must fail as well.  Moreover, CME Deems, CMO Tootell, Dr.

5  Pratt, and Warden Chappell also state that to the extent that they reviewed the medical care

6  provided to Plaintiff by Dr. Garrigan, they were fully satisfied that Plaintiff's medical needs were

7  being met.  Docket No. 29-4 at ¶¶ 8, 9 and Exs. A–D; Docket No. 29-5 at ¶ 3; Docket No. 29-6 at

8  ¶¶ 6, 10; Docket No. 29-8 at ¶¶ 8, 9, 18, and 21–25.

9                    **3)   State Law Claims**

10  Plaintiff states generally that Defendants have legal duties under state law to ensure that

11  Plaintiff is not subjected to any harm.  If Plaintiff is referring to the Hippocratic Oath's exhortation

12  to "do no harm," "violation of the Hippocratic Oath, in itself, does not state a claim for a

13  constitutional violation."  *Brady v. Halawa Correctional Facility Medical Unit Staff*, Civil No.

14  05–00144 HG–KSC, 2006 WL 2520607, *13 at n.16 (D. Haw. 2006).  The Court liberally

15  construes his complaint as stating state-law claims of patient abandonment and medical

16  malpractice.  *See Hughes v. Rowe*, 449 U.S. 5, 9 (1980) ("It is settled law that the allegations of [a

17  *pro se* plaintiff's] complaint, 'however inartfully pleaded' are held 'to less stringent standards than

18  formal pleadings drafted by lawyers.'") (citations omitted).  The Court agrees with Defendants

19  that Plaintiff has failed to create a triable issue of fact as to whether Dr. Garrigan has committed

20  either patient abandonment or medical malpractice.

21                    **a)   Patient abandonment**

22  Plaintiff argues that Dr. Garrigan subjected him to patient abandonment when she ended

23  his morphine prescription and prescribed him psychotropic medications to address his pain.

24  Plaintiff misunderstands the state-law patient abandonment claim.  Under California law, a

25  physician may abandon a patient "after due notice, and an ample opportunity afforded to secure

26  the presence of other medical attendance."  *Payton v. Weaver*, 182 Cal. Rptr. 225, 229 (1982)

27  (finding no patient abandonment where physician gave patient notice that he would no longer

28  provide treatment and gave patient a list of other potential care providers); *Hongsathavij v. Queen*

United States District Court
Northern District of California

20

*of Angels/Hollywood Presbyterian Medical Ctr.*, 73 Cal. Rptr. 2d 695, 704 (1998) (finding patient abandonment where physician refused to provide treatment to patient in premature labor because she was not a County-referred or County-insured patient).  Patient abandonment refers to when a physician ceases treating a patient and fails to provide the patient with sufficient notice to obtain alternative care.  Plaintiff was, and remains, under the care of the CDCR's Health Services System.  When Dr. Garrigan ceased being his PCP, he was immediately transferred to the care of Dr. Leighton.  Plaintiff has been seen by Dr. Leighton, who has attempted to address his medical concerns. *See* Docket No. 29-8 at 10–22.  To the extent that Dr. Garrigan ceased treating him, alternative care was immediately secured for him.  Plaintiff has failed to state a claim of patient abandonment.

### b)    Medical malpractice

Plaintiff alleges that Defendants committed medical malpractice under California law by failing to adequately treat his chronic pain.  The elements of a medical malpractice claim in California include: "(1) a duty to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) a breach of the duty; (3) a proximate causal connection between the negligent conduct and the injury; and (4) resulting loss or damage." *Hernandez ex rel. Telles–Hernandez v. United States*, 665 F. Supp. 2d 1064, 1076 (N.D. Cal. 2009) (citing *Hanson v. Grode*, 90 Cal. Rptr. 2d 396, 400 (1999)).  The standard of care against which the acts of a physician are to be measured is a "matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony." *Flowers v. Torrance Mem'l Hosp. Medical Ctr.*, 8 Cal. 4th 992, 1001 (1994).  "When a defendant moves for summary judgment and supports his motion with expert declarations that his conduct fell within the community standard of care, he is entitled to summary judgment unless the plaintiff comes forward with conflicting expert evidence." *Hutchinson v. U.S.*, 838 F.3d 390, 392 (9th Cir. 1988) (noting exception for conduct within the common knowledge of laymen).  Thus, in the context of a medical malpractice claim, "a plaintiff who has presented no expert evidence concerning the required standard of care has failed to make a sufficient showing that there are genuine factual issues for trial." *Id.* at 393.

1    Here, Dr. Garrigan has submitted a declaration explaining her medical decisions with

2  regard to Plaintiff's care, and asserted that she met the community standard of care.  Garrigan

3  Decl. at ¶ 14.  Dr. Tootell reviewed Plaintiff's medical records and also concluded that Plaintiff's

4  medical treatment met the community standard of care.  Docket No. 29-8 at ¶ 31.  As discussed

5  supra in I.B.2.b, various doctors have also agreed with Dr. Garrigan's treatment plan for Plaintiff.

6  Plaintiff has presented no conflicting expert evidence.  Accordingly, Defendants are entitled to

7  summary judgment on Plaintiff's medical malpractice claim.

8  **II.      Motions for Temporary Restraining Orders**

9    Plaintiff has filed three motions for a temporary restraining order, seeking restoration of

10  his previous pain management orders, referral to outside specialists, and a plan of treatment

11  prepared by outside specialists.  Docket Nos. 23, 37, and 53.  Because the Court has found

12  Plaintiff's claims to be without merit, these motions are DENIED as moot.  *Cf. Winter v. Natural*

13  *Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008) (requiring movant to establish *inter alia*

14  that he is likely to succeed on the merits).

15                                   **CONCLUSION**

16    For the foregoing reasons, Defendants' motion for summary judgment (Docket No. 29) is

17  GRANTED, and Plaintiff's motions for a temporary restraining order (Docket Nos. 23, 37, and

18  53) are DENIED.

19    The Clerk shall enter judgment and close the file.

20    **IT IS SO ORDERED.**

21  Dated: 2/3/2016

22                                   _Haywood S. Gill, Jr._

23                                   HAYWOOD S. GILLIAM, JR.
                                     United States District Judge

24

25

26

27

28

United States District Court
Northern District of California

22